## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                                    )
**Daniel Lee,**                                     )
                                                    )
   **Plaintiff,**                     )
                                                    )
   **v.**                             )   **Civil Action No. 10-10708-DJC**
                                                    )
**Michael J. Astrue, Commissioner,**                )
**Social Security Administration,**                 )
                                                    )
   **Defendant.**                      )
_____)

## MEMORANDUM AND ORDER

**CASPER, J.**                 July 14, 2011

## I. Introduction

  Plaintiff Daniel Lee ("Lee") filed a claim for disability insurance benefits ("SSDI") with the Social Security Administration. Pursuant to the procedures set forth in the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3), Lee now brings this action for judicial review of the final decision of Defendant Michael J. Astrue, Commissioner of the Social Security Administration ("the Commissioner"), issued by an Administrative Law Judge ("ALJ") on October 30, 2009, denying Lee's claim. The Decision Review Board ("the Board") selected the ALJ's decision for review but failed to act on the claim within the requisite time period. Accordingly, the ALJ's decision is the final decision of the Commissioner. 20 C.F.R. § 405.420(a)(2); see Lappen v. Astrue, No. 09-11857-WGY, 2011 WL 2424273, at *1 (D. Mass. June 17, 2011).

  Before the Court are Lee's Motion to Reverse or Remand the ALJ's decision and the Commissioner's Motion to Affirm that decision. In his motion, Lee claims that the ALJ erred in

denying his claim because: i) the ALJ ignored relevant evidence and consequently failed to evaluate Lee's carpal tunnel syndrome ("CTS"); and ii) the ALJ impermissibly accorded little weight to the opinion of Lee's treating psychologist, and, thus, there was no substantial evidence to support the ALJ's mental residual functional capacity ("RFC") findings. Because the ALJ was not required to evaluate any limitations stemming from Lee's CTS and because there is substantial evidence in the record to support the ALJ's mental RFC findings, the Commissioner's final decision is AFFIRMED.

## II.    Factual Background

Lee was 48 years old when he ceased working on July 28, 2005. See R. 88.[1]  He had previously worked in construction. R. 25. In his April 24, 2007 application for SSDI with the Social Security Administration ("SSA"), R. 7, 88-95, he alleged disability due to a back injury and high blood pressure. R. 102.

## III.    Procedural Background

Lee filed claims for SSDI with the SSA on April 24, 2007, asserting that he was unable to work as of July 28, 2005. R. 7. After initial review, his claims were denied on December 17, 2007. R. 55-57. His claims were reviewed by a Federal Reviewing Official and again denied on August 19, 2008. R. 49-54. On August 28, 2008, Lee filed a timely request for a hearing before an ALJ pursuant to SSA regulations. R. 63-64. A hearing was held before an ALJ on August 13, 2009. R. 20. In a written decision dated October 30, 2009, the ALJ determined that plaintiff did not have a disability within the definition of the Social Security Act and denied Lee's claims. R. 7-17.

Although the ALJ notified Lee that the SSA's Decision Review Board selected his claim for review, R. 1, the Board did not complete its review of Lee's claim during the requisite time period.

---

[1] Citations to the administrative record in this case, Docket No. 9, shall be to "R. __."

R. 1.  Accordingly, the ALJ's decision is the Commissioner's final decision.  20 C.F.R. § 405.420(a)(2); <u>Lappen</u>, 2011 WL 2424273, at *1.

## IV.  Discussion

### A.  Legal Standards

#### 1.  Entitlement to Disability Benefits

A claimant's entitlement to SSDI turns in part on whether he or she has a "disability," defined in the Social Security context as an "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 416(i), 423(d)(1)(a); 20 C.F.R. § 404.1505; <u>Mota v. Astrue</u>, No. 09-11817-RWZ, 2010 WL 4780477, at *1 (D. Mass. Nov. 16, 2010).  The inability must be severe, rendering the claimant unable to do his or her previous work or any other substantial gainful activity which exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511; <u>Mota</u>, 2010 WL 4780477, at *1.

The Commissioner must follow a five-step process when he determines whether an individual has a disability for Social Security purposes and, thus, whether that individual's application for benefits will be granted.  20 C.F.R. § 416.920; <u>Mota</u>, 2010 WL 4780477, at *2.  All five steps are not applied to every applicant; the determination may be concluded at any step along the process.  <u>Id.</u>  First, if the applicant is engaged in substantial gainful work activity, then the application is denied.  <u>Id.</u>  Second, if the applicant does not have, or has not had within the relevant time period, a severe impairment or combination of impairments, then the application is denied.  <u>Id.</u>  Third, if the impairment meets the conditions for one of the "listed" impairments in the Social

3

Security regulations, then the application is granted.  <u>Id.</u>  Fourth, if the applicant's "residual functional capacity" ("RFC") is such that he or she can still perform past relevant work, then the application is denied.  <u>Id.</u>  Fifth and finally, if the applicant, given his or her RFC, education, work experience, and age, is unable to do any other work, the application is granted.  <u>Id.</u>

## 2.  Standard of Review

This Court has the power to affirm, modify, or reverse a decision of the Commissioner upon review of the pleadings and record.  42 U.S.C. § 405(g); <u>Coughlin v. Astrue</u>, No. 09-30217-KPN, 2010 WL 4225380, at *1 (D. Mass. Oct. 20, 2010).  Such review, however, is "limited to determining whether the ALJ deployed the proper legal standards and found facts upon the proper quantum of evidence."  <u>Nguyen v. Chater</u>, 172 F.3d 31, 35 (1st Cir. 1999) (citing <u>Manso-Pizarro v. Sec'y of Health and Human Servs.</u>, 76 F.3d 15, 16 (1st Cir. 1996)).  The ALJ's findings of fact are conclusive when supported by substantial evidence.  42 U.S.C. § 405(g); <u>Phillips v. Barnhart</u>, No. 02-11115-RWZ, 2003 WL 21877761, at *1 (D. Mass. Aug. 8, 2003).  Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion."  <u>Rodriguez v. Sec'y of Health and Human Servs.</u>, 647 F.2d 218, 222 (1st Cir. 1981).

However, the ALJ's findings of fact "are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."  <u>Nguyen</u>, 172 F.3d at 35 (citations omitted).  Thus, if the ALJ made a legal or factual error, <u>Manso-Pizarro</u>, 76 F.3d at 16, the court may reverse or remand such decision to consider new, material evidence or to apply the correct legal standard.  <u>See</u> 42 U.S.C. § 405(g).

### B. Before the ALJ

#### 1. Medical History

The record before the ALJ included extensive evidence about Lee's medical history, including diagnoses and treatment, particularly in regard to the conditions upon which Lee relied in claiming a disability in his application for SSDI benefits.  Although Lee initially alleged that only his back pain and high blood pressure limited his ability to work, R. 102, the ALJ also evaluated evidence concerning Lee's hand impairments and depression with anxiety.  R. 7-17.

#### a. Back Pain

Medical records from Northwest Health Center demonstrate that Lee injured his back while working as a window installer on July 27, 2005.  R. 186, 200.  An MRI scan from July 29, 2005 revealed a tiny disc protrusion and degenerative changes in his spine, but no significant narrowing of the spinal column.  R. 198.  By September 26, 2005, Lee reported that his lower back pain had resolved, and he needed a release from his doctor to go back to work.  R. 191.  On November 2, 2006, however, Lee reported lower back pain after completing roofing work for his sister-in-law. R. 182.

Medical records from Urgent Medical Care and Landmark Medical Center indicate that on February 24, 2007, Lee exacerbated his back pain while lifting a door at Home Depot.  R. 161-62, 167.  An MRI exam from March 19, 2007 revealed degenerative changes in the lower lumbar spine and spinal disc deterioration.  R. 171-72.  Lesser degenerative changes were seen elsewhere in the lumbar spine.  R. 172.

On October 12, 2007, Dr. Youssef Georgy, a non-treating physician, performed a physical RFC assessment, which revealed that Lee could occasionally lift twenty pounds, frequently lift ten

pounds, stand or walk for a total of six hours in an eight-hour workday, and sit for a total of six hours in an eight-hour workday.  R. 207.  The RFC assessment also reported that Lee can occasionally stoop and crouch, but could frequently climb, balance, kneel, and crawl.  R. 208.  Dr. Georgy assessed no limitations in Lee's environmental, visual, or communicative abilities.  R. 209-10.

Treating physicians at Summa Health System performed another physical RFC assessment on June 1, 2009.  R. 455-60.  This RFC assessment revealed some physical limitations, but the physicians noted that Lee did not fully participate in testing and that Lee's demonstrated physical function "should not be used to project actual work capacity since he may be able to function at a level higher than willing."  R. 458-60.

### b.      Partial Contracture of the Fifth Finger of the Right Hand

The medical history concerning Lee's hand problems is not well-documented.  Medical records from Northwest Health Center reveal that, on July 31, 2007, Lee was diagnosed with right hand numbness and finger contracture (shortening of the muscles in the hand).  R. 252-53.  Lee was diagnosed with CTS on September 21, 2007 and referred for a CTS evaluation, but there is no evidence that such evaluation occurred.  R. 250-51.

On September 14, 2007, Dr. Thomas McGunigal performed a consultative examination of Lee, reporting that Lee's fifth digit (pinky) on his right hand had limited range of motion, but that there was "full range of motion in all other joints of the hands."  R. 204.  Dr. McGunigal also reported that the Phalen signs[2] were negative and Lee's motor power was limited in the right thumb;

---

[2] Phalen's maneuver is a diagnostic test for CTS.  <u>Dorland's Illustrated Medical Dictionary</u> ("Dorland's") 1117 (31st ed. 2007).

otherwise, motor power was normal in the wrists and hands. R. 204. Lee was diagnosed with lower back pain, right CTS, and finger contracture primarily affecting the fifth digit of his right hand. R. 205.

Dr. Georgy's physical RFC assessment from October 12, 2007 reported that Lee had limited function in his gross manipulation and that he should avoid frequent hand motions. R. 209. This RFC assessment revealed no other limitations in Lee's manipulative functions. R. 209.

### c. Depression with Anxiety and Poly-substance Abuse

Regarding Lee's mental impairments, much of the medical records concerning Lee's depression with anxiety involve primarily his attempts at detoxification and subsequent withdrawal symptoms. R. 13. On March 4, 2007, providers at Landmark Medical Center reported that Lee's psychiatric status was normal. R. 168.

On May 2, 2007, a provider at Northwest Health Center diagnosed Lee with hypertension, anxiety, and depression. R. 175. A July 11, 2007 report from Northwest states that Lee had "recently been diagnosed with anxiety and depression" and that he had been referred to counseling and started on medication. R. 201. Lee appeared multiple times at Northwest in July through September 2007 to receive treatment for, among other things, depression. R. 250-253. According to a Northwest provider, Lee seemed depressed and anxious, but his mood, affect, and insight were all stable and appropriate, and he was oriented. R. 250-253.

On November 14, 2007, Dr. James Curran, a psychologist, reported that Lee was alert, had good hygiene, maintained appropriate eye contact, and established good rapport. R. 214. Lee's speech was also normal, and he had no articulation problems; however, he was "not spontaneous and did not answer questions." R. 217. There was "no evidence of any thought disorder." R. 217.

Additionally, Lee performed well in cognitive testing, was oriented to date, and had followed his wife's directions to drive to Dr. Curran's practice, although Lee did not know the address. R. 217. His insight and judgment, however, appeared "somewhat limited," and he "appeared quite depressed." R. 217. Dr. Curran assessed severe major depressive disorder, severe post-traumatic stress disorder, and alcohol abuse. R. 218. Lee reported to Dr. Curran that he had already been depressed for approximately four or five years, and that he drinks approximately twelve beers a day and smokes cannabis occasionally. R. 217. (In an earlier exam with Dr. McGunigal on September 14, 2007, Lee revealed that he drinks approximately thirty beers a week. R. 203). Finally, Dr. Curran concluded that there was no evidence of any obsessive-compulsive disorder, generalized anxiety, or panic disorder. R. 217.

On December 10, 2007, Dr. Phillips, a non-examining state-agency psychologist, completed a Psychiatric Review technique form ("PRTF"), which reported that Lee suffered from depression, anxiety, and alcohol dependence. R. 220-32. However, Dr. Phillips reported that Lee's disorders caused either no or only mild functional limitations on Lee's activities of daily living, social functioning, concentration, persistence, and pace. R. 230. Furthermore, Dr. Phillips reported that there had been no episodes of extended decompensation due to Lee's mental impairments. R. 230. Dr. Phillips concluded that Lee's impairments were severe but that insufficient medical evidence supported their existence and severity prior to May 1, 2007. R. 232. Dr. Phillips also reported that Lee had a history of poly-substance abuse. R. 232. Finally, Dr. Phillips reported that Lee's impairments, with comprehensive treatment, would not persist at severe levels beyond May 1, 2008. R. 232.

In November and December 2007, a Northwest Health Center provider diagnosed Lee with

depression and hypertension and urged Lee to consider stopping alcohol. R. 247-49. Lee appeared well-oriented, and his mood, affect, and insight were all appropriate and stable. R. 247-49. In January 2008, a Northwest provider reported that Lee had reduced depression and anxiety. R. 244-45. Lee also stated that he felt "much better on Wellbutrin," that had been prescribed for his depression. R. 244-45. Lee presented again to Northwest complaining of increased depression and anxiety on February 21, 2008. R. 240-41. He reported that his wife had thrown away his Vicodin and that he was attempting to "cut down" on alcohol. R. 241.

Lee underwent detoxification on February 28, 2008, R. 255, 287, and presented to the Landmark Medical Center emergency room on March 7, 2008 with withdrawal symptoms, including altered mental state, tremors, and hallucinations. R. 255. Lee was admitted for these symptoms on March 8, 2008; by March 16, 2008, his condition had stabilized, and Dr. Sayed Sayeed, a Landmark physician, described him as oriented and attentive with normal speech. R. 289. Dr. Sayeed diagnosed Lee with chronic alcoholism and mild memory impairment, "chiefly for immediate recall." R. 289. On admission to the emergency room, Lee had reported that he drank approximately ten to fifteen beers a day for over twenty years. R. 262. He reported comparable daily consumption–12-16 cans of beer a day–to Dr. Sayeed on March 16, 2008. R. 289.

A psychiatric consultation assessment performed by Dr. Kahr from March 10, 2008 reported that Lee made good eye contract, was cooperative, and that his speech was coherent and relevant. R. 285. Lee stated that his primary care physician told him that he would die if he did not stop drinking. R. 285. Dr. Kahr concluded that Lee suffered from alcohol dependence and psychosis, but that Lee was no longer in alcohol withdrawal. R. 286. Finally, Dr. Kahr reported that Lee's "extreme anxiety and auditory hallucinations probably [were] secondary to the severity of his

alcoholism . . . ."  R. 286.

Treatment notes from Dr. Deihl from February 2008 through April 2008 describe Lee's depression and anxiety associated with his alcoholism, as well as his efforts to decrease his alcohol consumption, maintain sobriety, and attend Alcoholics Anonymous ("AA") meetings.  R. 304-10. Lee also reported that he was getting out of the house more to do yard work, but felt tired and had little motivation.  R. 311.  By May, however, Lee had begun drinking again and returned for detoxification.  R. 312-13.  Dr. Deihl's mental RFC assessment from July 11, 2008, four months after he had started treating Lee, reported that Lee had a "severe" impairment in every category of mental functioning.  R. 339-40.  This mental RFC assessment also reported that Lee was "unable to maintain sustained employment for the foreseeable future."  R. 340.  In the same time frame of July 2008, however, Dr. Deihl noted that Lee was "doing well in terms of getting out" and that he had managed "several yard projects."  R. 543.  Lee had a "harder time interesting [him]self to get out of [the] house" but had opportunities to fish, golf, and talk with friends.  R. 543.

### 2.    ALJ Hearing

At the August 13, 2009 administrative hearing, the ALJ heard testimony from two witnesses: Lee and vocational expert ("VE") Michael Orr.

### a.    Lee's Testimony

Lee testified that he had worked in construction for the fifteen years before he left work due to his alleged disability.  R. 25.  He resumed work briefly at the end of 2005 until January of 2006, but was then laid off because he needed time off for doctors appointments.  R. 25-26.  Lee testified that he is currently unable to perform any kind of work because he suffers from back pain, trouble breathing, and depression, and cannot open or bend his right hand.  R. 25, 27-28, 34-37, 39-40.

Additionally, Lee's attorney testified that Lee's hand problems are not "well documented." R. 28.

Concerning Lee's physical limitations due to his back problems, Lee testified that he could lift approximately ten to fifteen pounds if he "[doesn't] do it much," and he has no trouble sitting "as long as [he] can move once in awhile . . . ." R. 33. Lee also testified that he can be on his feet for about an hour before feeling back pain; by the time he finishes grocery shopping, his pain usually starts. R. 33. Lee testified that none of his medications cause any side effects, and that he takes ibuprofen approximately four or five times a week for his back pain. R. 36. Lee has approximately four "bad days" a week due to his back pain when he has to lie down or sit for a couple of hours. R. 38.

With respect to Lee's right hand problems, Lee testified that he hurt his right hand fifteen years ago when he fell off a wall at work, causing his fourth and fifth fingers to contract. R. 34. Consequently, Lee has difficulty turning off lights and opening the refrigerator at his sister's house because he cannot open his right hand fully. R. 34. However, Lee testified that there is nothing that he ordinarily did with his right hand in the past that he has had to stop doing or do with his left hand, such as eating and writing. R. 35. Regarding Lee's CTS, Lee stated that he is not sure what CTS is and that he maybe had electrical testing for CTS years ago when he hurt his hand. R. 35. No doctors, however, have recommended that Lee receive surgery or wear a brace on his hand or wrist. R. 35-36.

In addition to his hand and back problems, Lee stated that he cannot work due to his depression, which escalated after the death of his first wife in 2001. R. 39. Consequently, Lee has presented for hospitalization due to suicidal thoughts and acts, such as taking medication with alcohol. R. 40. Lee further testified that his depression has caused him to lose all ambitions and will

to care for himself, and he does not like leaving the house unless he has to. R. 40. Generally, Lee does not like leaving his house because he "[does not] care for crowds, for people," and feels safe at home. R. 41.

Lee also testified that he has a history of alcohol abuse since he was a teenager, but that he has never lost a job because of his drinking and continued drinking throughout his career in construction. R. 39. Lee's longest period of sobriety is approximately sixteen days. R. 39. Lee also testified to smoking a pack of cigarettes a day and abusing Vicodin. R. 29. Lee stated at the hearing that he is no longer taking any medication that is not prescribed to him, but he consumed alcohol approximately four or five days prior to the hearing. R. 30-31. He testified that now he only drinks alcohol on the weekends and when he goes camping. R. 31.

Regarding Lee's daily activities, Lee testified that he spends much of his day watching TV, on the computer, or sitting outside. R. 31. Lee also washes dishes for his sister, cooks, does laundry, and mows the lawn along with his sister. R. 32. Lee does not vacuum or sweep, and he no longer drives because he lost his first wife in a car accident and thus no longer "like[s] to drive." R. 32. Instead, Lee's sister drives him to his doctors appointments. R. 33. Lee only visits his sister and goes camping with her; otherwise, he does not associate with any one else. R. 33.

### b. VE's Testimony

The VE, Michael Orr, testified that he was present during Lee's testimony and had an opportunity to review the documents pertaining to Lee's age, education, and past work. R. 42. He stated that Lee's past work in construction involved very heavy and unskilled work as well as medium and skilled work. R. 42. The ALJ posed the following hypothetical to the VE:

> Mr. Orr, I'd like you to consider a hypothetical claimant of the same
> age and education and work background as this claimant. With a

residual functional capacity for a range of work that is [sic] elements of light and sedentary. The claimant would be able to stand or walk up to six hours in an eight hour day as in light work; would be able to lift a maximum of 20 pounds occasionally; and 10 pounds or less frequently. With his dominant right hand used alone, it would be limited to sedentary levels of lifting or carrying or forced exertion. . . . [T]o the extent that activities require fingering or fine manual dexterity, the claimant with the dominant right hand would be limited to activities that could be performed with the thumb and index and middle finger. R. 43. The claimant would also be limited to unskilled work tasks performed over an eight-hour workday. He would require work breaks every two hours. These limitations would rule out the claimant's past work and any transferability of acquired work skills. Is that correct? R. 44.

The VE responded that these limitations would prevent Lee from performing any of his past relevant work, and there would be no transferability of acquired work skills. R. 44. However, the VE testified that there were jobs in the national economy that Lee could perform, including messenger or courier, press machine tender, machine operator, and security personnel. R. 45. The VE clarified that these are all light unskilled jobs. R. 45. The VE further testified that if the same hypothetical claimant were limited to sedentary exertion, he or she could still find work as, among other things, security personnel, machine operators, quality control inspectors, and production inspectors. R. 45-46. According to the VE, if the same hypothetical claimant's limitations in concentration were at the moderately severe level, then employment would be precluded. R. 46.

### 3. Findings of the ALJ

Following the five-step process, 20 C.F.R. § 416.920, at step one, the ALJ found that Lee did not engage in substantial gainful activity during the period from his alleged onset date of July 28, 2005 through his date last insured ("DLI") of December 31, 2007. R. 9. The ALJ noted that Lee returned to work for two months in 2006, after the alleged disability onset date, but that this work activity did not rise to the level of substantial gainful activity. R. 9. Lee does not dispute the ALJ's

13

findings at step one.

At step two, the ALJ found that Lee had the following severe impairments: partial contracture of the fifth finger of the dominant right hand, back pain, depression with anxiety, and poly-substance abuse. R. 10. Lee does dispute the Commissioner's determination regarding Lee's severe impairments, stating that the ALJ failed to evaluate Lee's alleged CTS. (Pl. Br. 8). The ALJ did not address Lee's alleged CTS in his opinion, listing Lee's partial contracture of the fifth finger of his right hand as the only severe hand impairment. R. 10.

At step three, the ALJ found that, through the date last insured, Lee did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 10. Lee does not dispute the ALJ's findings at step three.

Before reaching his step four determination, the ALJ determined Lee's residual functional capacity, finding that, through the date last insured, Lee "had the [RFC] to perform light work as defined in [20 C.F.R. § 404.1567(b)] except [Lee] is limited to sedentary tasks that can be performed with the use of the thumb, index, and middle fingers with his dominant right hand as he cannot perform five finger grasping or gripping with his right hand and he has a moderate limitation in his ability to sustain concentration and attention, limiting him to unskilled work tasks." R. 11. Consequently, at step four, the ALJ determined that Lee cannot perform any of his past relevant work in construction because such work requires at least medium exertional lifting. R. 15. Lee disputes the ALJ's RFC assessment, arguing that the ALJ improperly rejected the opinions of a treating psychologist, Dr. Deihl, and, thus, the ALJ's mental RFC findings are not supported by substantial evidence. (Pl. Br. 10). The ALJ gave little weight to Dr. Deihl's assessment that Lee

cannot sustain employment due to his mental impairments, because the ALJ determined that Dr. Deihl's opinion did not provide a supporting rationale and Dr. Deihl had only been treating Lee for four months at the time of the assessment. R. 13. Consequently, the ALJ relied on another mental RFC assessment as well as other parts of the record to conclude that Lee suffered only a moderate limitation in his ability to sustain concentration and attention. R. 7-17. Lee does not, however, dispute the ALJ's findings at step four, namely, that Lee is precluded from performing his past relevant work.

At step five, the ALJ found that despite Lee's physical and mental impairments, Lee is able to perform other work that exists in significant numbers in the national economy. R. 15. As a result, the ALJ did not find Lee disabled at any time prior to the expiration of Lee's insured status. R. 7-17. Lee disputes this finding, arguing that had the ALJ not rejected Dr. Deihl's medical opinion, the ALJ would have found that Lee's mental RFC precludes any kind of employment.

### C.    Lee's Challenges to the ALJ's Findings

Lee contends that the ALJ erred by (1) ignoring Lee's diagnosis of CTS and thus failing to include any CTS-related limitations in the ALJ's hypothetical questions to the VE; and (2) rejecting the opinions of a treating psychologist, Dr. Deihl, which stated that Lee had severe limitations in all areas of mental functioning and could not sustain employment for the foreseeable future, R. 339-40. Lee's first challenge relates to the ALJ's determination at step two; Lee argues that the ALJ ignored evidence of Lee's CTS and did not evaluate Lee's functional limitations due to his CTS. The second challenge relates to the ALJ's mental RFC determination and findings at step five; Lee asserts that the ALJ improperly rejected Dr. Deihl's mental assessment of Lee and thus erred in determining that Lee had only moderate limitations in his ability to sustain concentration and attention, which allow

Lee to still perform jobs that exist in significant numbers in the national economy.

### 1.    Lee's Carpal Tunnel Syndrome

Lee argues that the ALJ impermissibly ignored any evidence or diagnosis of CTS at step two and did not properly inquire into whether Lee's CTS resulted in any limitations.  (Pl. Br. 8-9).  He further argues that, as a result, the ALJ improperly failed to include CTS-related limitations in his hypothetical questions to the vocational expert and thus did not include such limitations in the ALJ's RFC findings.  (Pl. Br. 9).

At step two, the ALJ must determine whether a claimant suffers from "a severe impairment that significantly limits the claimant's physical or mental ability to do basic work activities."  White v. Astrue, No. 10-10021-PBS, 2011 WL 736805, at *6 (D. Mass. Feb. 23, 2011) (internal quotations omitted) (quoting Bowen v. Yuckert, 482 U.S. 137, 141-42 (1987)).  A claimant carries the burden at step two to prove that he or she suffers from such a "severe impairment."  White, 2011 WL 736805, at *6 (internal quotations omitted) (quoting Bowen, 482 U.S. at 141-42).  To meet this burden, a claimant must use "objective medical evidence" to demonstrate that his or her condition meets the above standard of severity.  White, 2011 WL 736805, at *6 (internal quotations omitted) (quoting 20 C.F.R. §§ 404.1520, 404.1529).  Here, Lee has not met this burden, and the ALJ was not required to evaluate any alleged limitations associated with Lee's CTS.

Lee points to only three instances in the record that document Lee's CTS.  First, Dr. McGunigal, from the Rehabilitation Hospital of Rhode Island, examined Lee and assessed that Lee suffers from lower back pain, right CTS, and bilateral contracture affecting the right fifth finger.  R. 205.  Dr. McGunigal's report, however, does not provide any evaluation of Lee's functional abilities, and "[a] mere diagnosis of a condition 'says nothing about the severity of the condition.'"

White, 2011 WL 736805, at *6 (quoting Higgs v. Bown, 880 F.2d 860, 863 (6th Cir. 1988)). Additionally, Dr. McGunigal's report is internally inconsistent; he assessed CTS, but the Phalen test performed was negative. R. 204. Dr. McGunigal also notes that Lee had a full range of motion in all the other joints in his hands, and the muscle bulk in Lee's hands and wrists was normal, except for minimally reduced strength in Lee's right thumb. R. 204.

Second, Lee cites to Dr. Georgy's assessment of Lee's functional limitations, which relies on Dr. McGunigal's CTS diagnosis, and reports that Lee has limited fine finger manipulation and should avoid frequent hand motions. R. 207-09. Dr. Georgy's report, however, does not specifically attribute Lee's limitation in fine manipulation to CTS. The report is vague as to the cause of Lee's hand limitation and does not mention CTS, other than Dr. Georgy's relying on Dr. McGunigal's medical reports in assessing Lee's physical RFC. R. 207. Additionally, it appears that Lee's fine manipulation limitations are likely caused by Lee's finger contracture – which the ALJ cited as a severe impairment at step two – as Dr. Georgy assessed no other limitations in Lee's manipulative functions. R. 7-17, 209. The ALJ even states in his opinion that "the contracture of [Lee's] right pinky finger prevents him from using that finger for fine manipulations." R. 12.

Finally, Lee cites to an RFC assessment performed in June 2009 at Summa Health Systems that reports that Lee is limited to an hour of activities involving use of his hands. R. 457. However, this RFC assessment was performed beyond the date last insured of December 31, 2007, and, to obtain SSDI, a claimant must demonstrate that his or her disability was present during the period in which he or she had insured status. See 42 U.S.C. § 423(c); 20 C.F.R. §§ 404.101, 404.130-404.131; SSR 83-20, Titles II and XVI: Onset of Disability, 1983 WL 31249, at *1 (S.S.A. 1983). This RFC assessment provides no indication of Lee's RFC from the date of the alleged onset of

Lee's disability through the date last insured ("DLI") of December 31, 2007. Furthermore, the RFC assessment reports that Lee "did not fully participate in testing," and that his demonstrated physical function should "not be used to project actual work capacity since he may be able to function at a level higher than willing." R. 458.

Consequently, Lee did not meet his evidentiary burden through "objective medical evidence" demonstrating that Lee's CTS "significantly" limits his ability to do basic work activities. See 20 C.F.R. §§ 404.1520, 404.1529. Lee's attorney admitted at the hearing that Lee's hand problems are not "otherwise well documented" apart from Dr. McGunigal's notes and the physical capacity evaluation discussed above. R. 28. Accordingly, the ALJ was not required to consider Lee's CTS at step two, and Lee's step two challenge is unavailing as a matter of law.

While the ALJ was not required to consider Lee's CTS, the ALJ did evaluate and accurately capture all of Lee's hand limitations. Although the ALJ did not refer to CTS by name in his opinion, he did review the entire record, R. 7-17, and a transcript of the hearing demonstrates that he fully inquired into Lee's functional limitations regarding Lee's right hand. The ALJ's findings are supported by substantial evidence.

At the hearing, Lee made it clear that he only has problems in his right hand, R. 43, and that he has partial contracture in only his fourth and fifth fingers. R. 33-34. This partial contracture causes some pain and limits Lee's ability to carry certain things or carry out certain actions, such as opening up a refrigerator or turning off a light switch, because he cannot completely flatten his hand. R. 34. Moreover, Lee stated that he continues to do everything he used to do with his right hand, despite his impairments, such as eating and writing. R. 35. Lee also testified that he does not know what CTS is and that no doctor has ever recommended that he wear a brace on his hand or

18

wrist or undergo surgery. R. 35-36. This testimony clearly indicates that Lee's hand impairments cause primarily intermittent pain and contraction. The hearing transcript also demonstrates that the ALJ thoroughly inquired into Lee's hand limitations.

Given Lee's own statements and the general lack of evidence regarding Lee's CTS, the ALJ's hypothetical question to the VE, which specified that Lee's dominant right hand "would be limited to activities that could be performed with the thumb and index and middle finger," R. 43, accurately captured all of Lee's hand limitations. An ALJ must complete the RFC assessment based on "all the relevant medical and other evidence in the case record," Resendes v. Astrue, No. 09-11044-NG, 2011 WL 669090, at *11 (D. Mass. Feb. 17, 2011) (internal quotations omitted) (quoting 20 C.F.R. § 404.1520(e)), including claimant's testimony, reports of claimant's activities, claimant's courses of treatment, and medical tests and opinions of treating physicians, Nguyen, 172 F.3d at 31, 34. Here, the ALJ followed the above regulations, and his failure to mention CTS at step two implies not that he ignored Lee's diagnosis of CTS, but that he determined that Lee's CTS has little or no effect on Lee's functional abilities. Substantial evidence supports this determination. Thus, Lee's argument regarding his alleged severe CTS lacks merit.

## 2.    The ALJ's Discrediting of Dr. Deihl's Medical Report

Lee also contends that the ALJ's finding that Lee has only a moderate limitation in his ability to sustain concentration and attention is not supported by substantial evidence, because the ALJ did not grant Dr. Deihl's medical opinion significant probative value. (Pl. Br. 10). Generally, an ALJ "must give more weight to the opinions from the claimant's treating physicians, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of the claimant's medical impairments." Rodriguez v. Astrue, 694 F.Supp.2d 36, 42 (D. Mass. 2010)

(internal quotations omitted) (quoting 20 C.F.R. § 416.927(d)(2)).  However, if the treating physician's medical opinion is internally inconsistent or inconsistent with other substantial evidence in the record, the ALJ may "downplay" the treating doctor's assessment.  Arruda v. Barnhart, 314 F.Supp.2d 52, 72 (D. Mass. 2004); see Coggon v. Barnhart, 354 F.Supp.2d 40, 50-56 (D. Mass. 2005) ("'the [ALJ] may reject a treating physician's opinion as controlling if it is inconsistent with other substantial evidence in the record, even if the evidence consists of reports from non-treating doctors'") (quoting Castro v. Barnhart, 198 F.Supp.2d 47, 54 (D. Mass. 2002).  Inconsistencies between a treating physician's opinion and other evidence in the record are for the ALJ to resolve. Costa v. Astrue, 565 F.Supp.2d 265, 271 (D. Mass. 2008) (citing Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).

### a.     Granting Controlling Weight to Treating Physicians' Opinions

Dr. Deihl's opinion was not entitled to controlling weight because it was both internally inconsistent and inconsistent with other substantial evidence in the record.  Despite his assessment that Lee is severely impaired in every category of mental functioning, R. 339-40, Dr. Deihl reported, a week after the mental RFC assessment, that Lee was "doing well in terms of getting out" and that he had managed "several yard projects."  R. 543.  He also stated that while Lee had a "harder time interesting [him]self to get out of [the] house," he also had opportunities to fish, golf, and talk with friends. R. 543.  These treatment notes clearly contradict Dr. Deihl's mental RFC assessment, which states, among other things, that Lee is severely impaired in his ability to perform daily activities and both simple and complex tasks.  R. 339-40.

Lee's own testimony as well as other medical records do not substantiate the severe limitations posited by Dr. Deihl.  Despite the fact that Lee reported in 2007 that he had been

depressed for approximately four or five years, R. 217, Lee had still been able to work until July 2005. R. 7. Moreover, Lee returned to work briefly in December 2005 and January 2006 and carried out roofing work for his sister-in-law. R. 25-26, 182. The ALJ also correctly noted that Lee carries out significant activities of daily living, such as mowing the lawn, cooking, camping, grocery shopping, and leaving the house for doctors and other necessary appointments. R. 31-33. Lee's testimony clearly contradicts Dr. Deihl's assessment that Lee is severely impaired in his ability to follow instructions, maintain his personal habits, and perform both varied and repetitive tasks. R. 339-40.

Other medical records reveal that Lee was diagnosed and treated for depression, anxiety, and hypertension on a number of occasions. E.g., 175-76, 217-18, 220-32, 250-53. However, despite these diagnoses, the record demonstrates that Lee generally had good hygiene, normal speech and articulation, and was able to maintain eye contact and establish a good rapport with his doctors. E.g., R. 214-17. Dr. Phillips noted, in November 2007, that there was no evidence that Lee suffered from obsessive-compulsive disorder, generalized anxiety, or panic disorder. R. 217. Lee also frequently presented with a normal psychiatric status, and although he often appeared depressed and anxious, his mood, affect, and insight were generally stable and appropriate, and he was oriented. E.g., R. 168, 247-49, 250-51. Just days after his DLI of December 31, 2007, Lee reported that he felt "much better on Wellbutrin." R. 244-45. Finally, Dr. Phillips' mental RFC assessment from December 2007 reported that Lee had severe mental impairments, but that they resulted in at most mild limitations in terms of Lee's social functioning, activities of daily living, and ability to maintain concentration, persistence, and pace. R. 230. Dr. Phillips also reported that there was no evidence of any episodes of decompensation due to Lee's impairments. R. 230.

Given the evidence above, the ALJ was on firm ground in denying Dr. Deihl's mental RFC assessment controlling weight due to its internal inconsistencies and extensive inconsistencies with other substantial evidence in the record. Although some of the evidence could have supported a different determination, "[i]t was the duty of the ALJ to resolve [any] conflicts in the evidence," and this Court must defer to the ALJ's judgment as long as it is supported by substantial evidence. Konigsberg v. Astrue, No. 08-10120-NMG, 2010 WL 1794630, at *7, 10 (D. Mass. Mar. 8, 2010) (citing Rodriguez Pagan v. Sec'y of Health & Human Servs., 819 F.2d 1, 3 (1st Cir. 1987)).

### b. Weighing Medical Opinions

If an ALJ decides not to afford a treating physician's opinion controlling weight, he or she must evaluate several factors in deciding how to weigh such a medical opinion: 1) the length of the treatment relationship and the frequency of examination; 2) the nature and extent of the treatment relationship; 3) the relevant evidence in support of the medical opinion; 4) the consistency of the medical opinion reflected in the record as a whole; 5) whether the medical provider is a specialist in the area in which he renders his opinions; and 6) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527(d). An ALJ may afford little probative value to a treating physician's opinion as long as he or she provides a reasonable explanation for doing so and the contrary finding is supported by substantial evidence. See Shields v. Astrue, No. 10-10234-JGD, 2011 WL 1233105, at *7 (D. Mass. Mar. 30, 2011) (citing Monroe v. Barnhart, 471 F.Supp.2d 203, 211-12 (D. Mass. 2007)).

First, the ALJ correctly notes in his opinion that Dr. Deihl had been treating Lee for less than four months when he assessed Lee's mental RFC. R. 13, 337. While treating source opinions are generally awarded more weight because they often provide a "longitudinal picture" of a claimant's

impairment, see 20 C.F.R. § 404.1527(d)(2), Dr. Deihl performed Lee's mental RFC assessment shortly after he began treating Lee. A four-month period does not provide a "longitudinal picture" of a claimant's impairment, especially given the extensive record prior to Dr. Deihl's mental RFC assessment that does not support such severe limitations on Lee's mental abilities. See Dietz v. Astrue, No. 08-30123-KPN, 2009 WL 1532348, at * 6 (D. Mass. May 29, 2009) (holding that a treating physician's medical opinion was entitled to greater deference because the physician had treated the claimant over a "significant period of time").

The ALJ also emphasized the lack of supporting rationale in Dr. Deihl's mental RFC assessment. R. 13. Generally, the more a treating medical source presents relevant evidence, "particularly medical signs and laboratory findings," to support an opinion, or the better an explanation a source provides for an opinion, the more weight an ALJ should give that opinion. 20 C.F.R. § 404.1527(d)(3); Charon v. Astrue, No. 09-11774-NG, 2011 WL 2268310, at *8 (D. Mass. June 6, 2011). As the ALJ noted, R. 13, Dr. Deihl does not provide any explanation for his assessment, and there is no evidence in the record that Dr. Deihl relied on any laboratory findings, diagnostic tests, or any portion of Lee's extensive medical record. Without any underlying explanation for Dr. Deihl's belief that Lee is severely impaired in every category of mental functioning, which Dr. Deihl defines as an extreme impairment of ability to function, R. 340, the ALJ properly emphasized this weakness in Dr. Deihl's assessment.

Finally, the ALJ noted that Dr. Deihl's mental RFC assessment is inconsistent with Dr. Deihl's subsequent treatment notes. See R. 13. As already stated, shortly after Dr. Deihl performed the mental RFC assessment, Dr. Deihl reported that Lee was "doing well in terms of getting out" and that he had managed "several yard projects." R. 543. He also stated that while Lee had a "harder

time interesting [him]self to get out of [the] house," he also had opportunities to fish, golf, and talk with friends. R. 543. These subsequent treatment notes undermine Dr. Deihl's assessment that Lee's has an "extreme impairment" of his abilities to pursue his interests, relate to other people, follow instructions, and perform both varied and repetitive tasks, R. 339-40. See Arruda, 314 F.Supp.2d at 72. Given the evidence above, the ALJ provided adequate reasons for his discrediting of Dr. Deihl's mental RFC assessment and assertion that Lee cannot sustain employment for the foreseeable future.

Further, as this Court has already explained, Dr. Deihl's medical opinions are inconsistent with much of the record as a whole. First, Dr. Deihl's report is an outlier. Compare R. 337-40 with e.g., R. 214-17, 220-32, 247-49, 250-51. Second, the record supports the bulk of the ALJ's findings, e.g., R.168, 214-217, 230, 247-49, 250-51, both as to the medical evidence and as to Lee's daily activities. The record indicates that Lee engaged in some employment, performed roofing work for his sister-in-law, managed several yard projects, and engaged in significant activities of daily living, including cooking, mowing the lawn, camping, grocery shopping, and leaving the house for doctors and other necessary appointments. R. 25-26, 31-33, 182, 543. In sum, the bulk of the evidence supports the ALJ's findings and not Dr. Deihl's minority view. See McDougal v. Astrue, No. 09-40035-FDS, 2010 WL 1379901, at *10 (D. Mass. Mar. 31, 2010) (holding that if a treating physician's opinion is inconsistent or unsupported by the record, the ALJ will not give it significant weight).[3]

_____

[3] Additionally, the timing of Dr. Deihl's assessment suggests that if the ALJ had relied primarily on the assessment to find that Lee was disabled, the ALJ might have erred as a matter of law. Dr. Deihl performed the assessment in July 2008. R. 337-40. This is well outside the period of July 28, 2005 through December 31, 2007, the period for which Lee had insured status. R. 9 (ALJ's determination of the end of Lee's period of insured status). Dr. Deihl's assessment refers to the relevant time period only in a cursory manner. R. 337-40 (stating that the severity of Lee's

## V.    Conclusion

Based on the foregoing, the Commissioner's motion to affirm is GRANTED and Lee's motion to reverse or remand is DENIED.

**So ordered.**

/s/ Denise J. Casper
United States District Judge

---

mental impairment "likely" had existed "for years" before Dr. Deihl's assessment but providing no factual support for this assertion).  To obtain SSDI, a claimant must demonstrate that his or her disability was present during the period for which he or she had insured status.  <u>See</u> 42 U.S.C. § 423(c); 20 C.F.R. §§ 404.101, 404.130-404.131, SSR 83-20, <u>Titles II and XVI:  Onset of Disability</u>, 1983 WL 31249, at *1 (S.S.A. 1983).  Dr. Deihl's assessment has little relationship to Lee's period of insured status, and, as already discussed, is controverted by substantial evidence within the relevant time period.  Under these circumstances, it is possible that Dr. Deihl's report is legally insufficient to provide substantial evidence for an ALJ's findings.  <u>See</u> <u>Carillo Marin v. Sec'y of Health & Human Servs.</u>, 758 F.2d 14, 16 (1st Cir. 1985) (noting that although the medical evidence "lacks precision and focus in light of the . . . relevant time period," the ALJ could not ignore it where it was the "*only* medical evidence before the ALJ" relevant to the period of insured status) (emphasis in original); <u>see also</u> <u>Resendes v. Astrue</u>, No. 09-11044-NG, 2011 WL 669090, at *13 (D. Mass. Feb. 17, 2011) (concluding that certain medical evidence was "not . . . sufficient information for the ALJ to determine whether the ailments [the claimant] suffered in earlier or later years were likely present [during the period of insured status]" because such evidence could not support "reasonable conclusions as to [the claimant's] physical capabilities during the relevant time period").